**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERT DIAZ SANCHEZ,<br><br>  Plaintiff,<br><br>  v.<br><br>JEFFREY BEARD and NEIL McDOWELL,<br><br>  Respondents. | Case No. 1:14-cv-01204-DAD-SMS<br><br>FINDINGS AND RECOMMENDATION TO GRANT RESPONDENTS' MOTION TO DISMISS<br><br>(Doc. 24) |

    Petitioner is a state prisoner represented by counsel with a petition for writ of habeas corpus under 28 U.S.C. § 2254. In his petition, filed on July 31, 2014, and amended on January 16, 2015, Petitioner alleges ineffective assistance of trial counsel in violation of his federal constitutional rights and error by the trial judge in failing to grant relief thereon. Docs. 1, 16. Respondents have filed a motion to dismiss the petition on the ground that it was filed after the one year statute of limitations under 28 U.S.C. § 2244(d). Doc. 24. Petitioner has submitted an opposition to the motion to dismiss. Doc. 31.

    This Findings and Recommendation is submitted to United States District Judge Dale A. Drozd under 28 U.S.C. § 636(b)(1) and Local Civil Rule 302 of the United States District Court for the Eastern District of California.

    Based upon the documents presently before the Court and for the reasons stated below, the Court recommends that Respondent's motion to dismiss be granted.

I.   BACKGROUND

    A.  *Facts[1]*

Petitioner was charged with three counts of first degree murder, with a multiple murder special circumstance, and the special allegation that defendant personally used a firearm; one count of attempted first degree murder with the special allegation that defendant personally used a firearm; four counts of kidnapping; and three counts of second degree robbery.  The charges stemmed from an incident on May 22, 2005, where he held four men at gunpoint in a house, repeatedly threatened to kill them, and forced them into a vehicle.  Petitioner followed the vehicle as his accomplice, Gavino[2] Luis Basurto,[3] drove the four men onto a field and fatally shot three of them—Rafael Moreno Espinoza, his brother, Eraclio Moreno Espinoza, and Juan Zepeda Valencia, also known as Carlos Albert Figueroa.  The fourth man, Cuahutemoc Valencia ("Valencia"), ran away as the other men were murdered and survived the harrowing incident.  A jury convicted Petitioner of three counts of second degree murder, one count of attempted second degree murder, and four counts of kidnapping.

The parties presented the following testimonies at Petitioner's trial:

    1.   Valencia's Testimony

Valencia testified that he, Juan, Eraclio and Rafael went to a house belonging to Juan's friend, later identified as Basurto.  Valencia did not know Basurto.  When they arrived, Juan parked the vehicle, a Jeep Cherokee, in front of Basurto's house.  After Basurto let the men into the house,

---

[1] The relevant facts are taken from the June 25, 2012, opinion of the California Court of Appeal, Fifth Appellate District.
[2] In its opinion, the California Court of Appeal spelled "Gabino with a "b." Lodged Doc. 3.  At Petitioner's state habeas hearing on January 14, 2013, Gabino stated his name is spelled with a "v." Lodged Doc. F.
[3] Basurto was separately tried and convicted of three counts of first degree murder, with a multiple murder special circumstance, and one count of attempted first degree murder.  He was sentenced to seventy-five years plus twenty years to life without parole, followed by three consecutive terms of twenty-five years to life, and three consecutive life terms without the possibility of parole.  Lodged Doc. 3

2

they walked into the living room.  Basurto immediately locked the front door from the top and bottom.  Basurto said he was going to use the restroom and walked out of the living room.  Within a few moments, Basurto returned to the living room with two gunmen, later identified as Petitioner and Francisco Diaz, Petitioner's uncle.  Petitioner pointed a handgun at everyone.  Valencia was afraid and apparently tried to run away.  Petitioner aimed the gun at Valencia and said that he would be killed if he tried to run.  Petitioner ordered Valencia, Rafael, Eraclio, and Juan to get on the floor, and the four men obeyed.  Petitioner told Basurto to tie up the men.  Using plastic zip-ties, Basurto tied up their hands and feet.  Petitioner then told Basurto to take everything from the victims.  Basurto complied and removed wallets and jewelry from Valencia, Rafael, and Juan, and placed them in a Macy's shopping bag.  Eraclio did not have a wallet.  Petitioner gave all the orders to Basurto and the other gunman.  At one point, Valencia heard Petitioner say that he was from Minnesota.

Valencia testified that Petitioner told Basurto and the other gunman to move the victims into a car in the garage.  Basurto and the other gunman lifted up Valencia and Rafael and carried them to a gray car parked in the garage.  Thereafter, Eraclio was brought into the garage, untied, and told to start the car.  The car did not start, however, and the second gunman removed Valencia and Rafael from the car and took them back into the house.  Petitioner was present when Basurto cut the plastic ties and used tape to restrain their hands.  He told Basurto to kill everyone or he would kill Basurto and his family.

Valencia testified that Petitioner then told the victims that they were going to take them to a place and leave them there, and they would call their families the next day to pick them up. Petitioner, Basurto, and the other gunman then took the victims to the Jeep.  Juan was placed in the front passenger seat, Valencia was in the rear passenger-side seat, Eraclio was in the rear driver's-side seat, and Rafael was in the middle of the back seat.  Basurto got into the Jeep and drove away from the house with the victims.  Valencia, at one point, looked back and thought a black truck was

3

following them.

Valencia testified that Basurto drove the Jeep onto a field and stopped by a big pile of dirt, at which point he/Valencia opened the back door and ran because he was frightened by Petitioner's repeated orders to shoot all the victims. As he ran from the Jeep, someone fired multiple gunshots at him. He looked back and saw flashes from the shots. He fell down, but was not wounded. He got up and kept running. His hands were still taped together, but he managed to bite off the tape with his teeth. Valencia continued to he hear gunshots fired behind him. He jumped a fence, landed in a residential area, and started knocking on doors. Someone finally opened their door, and Valencia asked them to call the police.

Valencia further testified that he was still scared when the police arrived. He did not know what happened to his friends. He had never been involved with drugs or drug transactions. He did not know if any of his friends were involved with drugs. Valencia never saw any drugs while he was at Basurto's house.

2. Officers' Testimony

Officers subsequently found three bodies in and around the Jeep. Their hands were duct-taped together. Also at the scene were 8 nine-millimeter shell casings, a Macy's bag containing the wallets of Juan, Rafael, and Valencia. Basurto's fingerprint was found on duct tape that was cut off from one of the victims. Basurto's cell phone was found in the field about twenty feet away from the Jeep.

The following day, officers searched Basurto's house and found a number of items: a knife on the living room coffee table, a shoebox containing $44,000 cash stacked by denominations in the living room's vaulted ceiling, an empty Glock gun box in a bedroom dresser drawer, $14,000 cash separated in thousand-dollar stacks in the same dresser, a box of .45-caliber Winchester ammunition on the top shelf of the bedroom closet, a magazine with .45-caliber rounds in a dresser drawer, and a scale with methamphetamine residue in the bedroom. In the garage, officers found a

Honda with a piece of a cut zip-tie on the rear passenger floorboard. Another piece of a cut zip-tie and a piece of used gray/silver duct tape were on the garage floor. The duct tape found in the garage was similar in color and size to the duct tape found on the field. A Volkswagen Passat with a Minnesota license plate was parked in front of the house. It was registered to Petitioner and the registration papers were found in the bedroom. The Honda and Volkswagen were X-rayed to look for hidden drug compartments but nothing was found.

Detective Joe Alvarado testified that on August 9, 2006, he received a call at his desk. The caller identified himself as Petitioner and said he was present when the three victims were killed, but did not pull the trigger. Petitioner was arrested nearly two years later, on April 17, 2008. Detective Alvarado also testified about Petitioner's postarrest statements regarding the kidnappings and murders. Petitioner told Detective Alvarado he had been living in Minnesota before the murders. He arrived in Fresno and was looking for money. He was invited to a party at Basurto's house for Diana Teran's daughter; Teran was Basurto's girlfriend. He had heard that Teran and Basurto were involved in robberies and would kill people.

Petitioner said that on the night before the murders, he met Basurto, Teran, and Francisco at a Fresno nightclub. A "contract" was made with Basurto that they were going to rob, steal drugs, and kill a drug dealer named "Juan." Petitioner described the contract as follows:

> Basically, that it was going to be a dope rip the following day. That [Petitioner] was going to be assisting … Basurto, the doper. And that they were going to pay Petitioner $6,000. And they talked about the details and the fact that they were going to tie up one of the drug dealers by the name of Juan. And they were going to take him out and kill him.

Petitioner agreed to assist in the contract for the robbery. He knew "they were going to end up killing Juan, but that his part was to, basically, hold a gun and point it at the victims," and he would be paid $6,000, as would Francisco. Petitioner and Francisco were also offered an additional $1,000 if they killed the drug dealer. They both "accepted it and eventually received it."

Petitioner said he and Francisco met Basurto at the house. Shortly afterward, the four victims arrived at the house. Basurto pulled his gun, and Petitioner and Francisco followed him. Petitioner held the victims at gunpoint while Basurto tied their hands and wrists with zip-ties. None of the victims were armed and Petitioner never saw any drugs. He said, however, that one of the victims arrived in a gray car and there was a suitcase of cocaine that had been removed from that car. Petitioner admitted that he told Basurto to kill all the men, but said he was just acting so the victims would not try anything.

Petitioner told Detective Alvarado that Teran was the "author" of the crime. The contract was only to kill one person, but three other people showed up. After the incident began, Petitioner talked to Basurto about the other victims and asked for more money "because there was an additional three bodies." Basurto offered Petitioner another $1,000 if he helped him kill all the victims. Petitioner claimed he did not accept the offer, though he remained in the house and continued to assist Basurto.

Petitioner said that he told Basurto and Teran not to kill anyone, and insisted he was only offered money to tie someone up so they could steal drugs. After Petitioner helped Basurto move the four victims into the Jeep, he and Francisco got into a black pickup truck and followed Basurto onto a field. Petitioner said he stayed in the truck while Basurto killed three of the men and did not hear anything because the windows were closed. He saw Basurto running with a handgun. Basurto then got into another black pickup truck driven by Teran. After the murders, Petitioner met Basurto and the others in Dinuba and they exchanged vehicles. Petitioner said he was eventually paid when the money was wired to him in Mexico.

3.  Petitioner's Testimony

In contrast to Valencia's and Detective Alvarado's testimony, Petitioner testified to a different version of events. Petitioner testified that Basurto was like an older brother to him. Basurto called Petitioner in Minnesota and asked him to help with a drug deal at the house. Basurto

said the drug deal involved almost $250,000 and asked Petitioner to provide protection for him. Francisco was also asked to provide security. Basurto promised to pay $6,000 to each.

Petitioner testified that when he initially arrived at the house, Basurto offered him another $1,000 to kill someone. Petitioner was surprised, refused, and told Basurto not to kill anyone. Basurto gave Petitioner a .22-caliber gun. Petitioner and Francisco waited in another room for the person to arrive, and they were only supposed to come out if there were problems. Then, Juan and the other three men arrived in two cars: a red Jeep, parked in front of the house, and a gray car, which a victim parked in the garage. Petitioner believed Valencia was in the gray car that pulled into the garage.

Petitioner admitted he pointed the gun at the victims but claimed he followed Basurto's orders, and that Basurto was on the telephone with Teran, who was giving the instructions. Basurto took the victims' wallets to check their identifications. Petitioner claimed Basurto was angry that three men arrived with Juan and threatened to kill all the men. He pleaded with Basurto not to kill them, and Basurto promised he would take the victims and "throw them out." When the problem escalated, Petitioner remained in the house and did not intervene or help the victims. Basurto then tied up the victims with duct tape, put them in the Jeep, and got into the driver's seat. At some point, a suitcase containing drugs was removed from the gray car. Petitioner gave the suitcase to Teran, who had arrived at the house. Teran opened the suitcase, and Petitioner saw packages which he believed contained cocaine.

Petitioner got into a black truck while Teran and Francisco were in another black truck. Petitioner asked Teran for directions to the freeway because Petitioner intended to drive to his sister's house in Dinuba. Teran told Petitioner to follow her car. Petitioner complied and they drove to a field. Petitioner never heard any shots in the field, but saw Basurto run and get into Teran's truck. Petitioner claimed he did not know anyone had been killed until they arrived at his sister's house in Dinuba, and Basurto told him.

7

Petitioner testified that he went to Basurto's house without knowing that Basurto was going to kill the men. Petitioner never threatened to kill Valencia or hurt anyone. None of the victims had any weapons, and he did not know them. Petitioner never called anyone for help that night because he was sure that Basurto was not going to kill the victims. Petitioner would have called the police if he knew that Basurto was going to kill the men.

B. *Procedural History*

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation by order of the Superior Court of California, County of Fresno. The trial court sentenced Petitioner on September 11, 2009, to an indeterminate term of forty-five years to life plus a determinate term of forty-seven years. Lodged Doc. 1. Petitioner appealed and the California Court of Appeal, Fifth Appellate District, issued an opinion affirming the judgment on June 25, 2012. Lodged Doc. 2. The California Supreme Court denied the petition for review on September 19, 2012. Lodged Doc. 4. Because Petitioner did not file a petition for writ of certiorari in the United States Supreme Court, his convictions became final ninety days later, on December 18, 2012. *See* U.S. Sup. Ct. R. 131.1.

After his conviction and sentencing, Petitioner filed five unsuccessful state post-conviction habeas corpus petitions:

1. California Court of Appeal, Fifth Appellate District
   Filed: July 11, 2011
   Denied: July 21, 2011

2. Fresno County Superior Court
   Filed: July 21, 2011
   Denied: January 15, 2013

3. California Court of Appeal, Fifth Appellate District
   Filed: August 15, 2013
   Denied: October 10, 2013

4. California Supreme Court
   Filed: October 21, 2013
   Denied: December 18, 2013

8

> 5. California Supreme Court
>    Filed: On July 31, 2014
>    Denied: December 17, 2014

Lodged Docs. 6-14.  He was, at all relevant times, represented by counsel.  Lodged Docs. 5, 7, 9, 11, 13.

The Fresno County Superior Court held an evidentiary hearing on January 14 and 15, 2013, to address the habeas petition filed on July 21, 2011.  At the hearing, Petitioner's present counsel, Roger Nuttall, examined Basurto, who provided testimony contrary to his own trial testimony.  In an attempt to vindicate Petitioner, Basurto stated that his own trial testimony, which was harmful to Petitioner, was a lie.  Specifically, he testified to meeting Nuttall and another attorney at Calipatria State Prison (where Petitioner was also housed) in 2010, and, thereafter, signing a declaration concerning his willingness to testify in Petitioner's trial.  Lodged Doc. F.  Basurto testified he tried to convey that willingness to Petitioner's relatives but was never contacted by Petitioner's trial counsel.  Basurto stated that "99 percent" of his own trial testimony was a lie.  He did not think that his trial testimony would hurt Petitioner, who was in Mexico at the time.

Basurto testified that he, instead of Petitioner, used a gun to shoot the victims, and that Petitioner was not present during the shooting.  Petitioner told Basurto several times not to shoot the victims and he falsely promised he would not.  Basurto hired Petitioner and Francisco as security, and nothing more, for the drug deal.  Basurto, not Petitioner, gave the orders, and while Petitioner and Francisco were armed, they did not use their guns.  Petitioner did not threaten Basurto if he did not comply with Petitioner's orders.

Responding to questions by the judge, Basurto stated he had half a million dollars for the drug deal in his bedroom at the time.  Upon discovering that the drugs were not of good quality, Basurto ordered Francisco to tie up the victims and take their cell phones and wallets.  When Basurto left the house with the four victims in the Jeep, he also took along with him the half a

million dollars. Petitioner and Francisco also left the house but did follow Basurto.

Finding Basurto to be "a terrible witness" at the hearing and in his own trial, the state court denied the habeas petition. The state court found it unbelievable that Petitioner was nothing more than hired security in a half-million dollar drug deal and explained that Basurto's testimony would actually add credibility to Valencia's by corroborating the important parts of his testimony which pointed to Petitioner as the lead player. The state court opined that under the circumstances, where Petitioner and Basurto were once housed in the same prison, a jury would naturally assume that Basurto was threatened to come to court and provide the exculpatory statements. Also questionable was the fact that Basurto's appeal process had ended before he provided the exculpatory statements. Further, Basurto's testimony about the amount of money he carried seemed unbelievable. Finding that Basurto's testimony would have done more damage than good, the state court concluded that Petitioner failed to show that a reasonable probability existed wherein he would have received a more favorable outcome had Basurto testified at Petitioner's trial. Lodged Doc. F.

C. DISCUSSION

 *A. Propriety of Respondents' Motion to Dismiss*

Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts[4] provides, in relevant part, "[i]f it plainly appears from the petition and any attached exhibit that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition . . . ." Rule 4 of the Rules Governing Section 2254 Cases. The Ninth Circuit has recognized that Rule 4 allows respondents to file a motion to dismiss a section 2254 petition for writ of habeas corpus. *White v. Lewis,* 874 F.2d 599, 602 (9th Cir. 1989) (concluding that a "motion to dismiss . . . is a valid pleading under the rules" governing actions brought under 28 U.S.C. § 2254). The Court will

---

[4] "The Rules Governing Section 2254 and Section 2255 Proceedings, as amended by Congress, became federal law on September 28, 1976, and made applicable to petitions filed under Section 2254 and motions filed under section 2255 on or after February 1, 1977. Pub. L. No. 94-426. The rules were last amended in 2009." United States Courts, http://www.uscourts.gov/rules-policies/current-rules-practice-procedure (last visited December 7, 2015).

therefore review Respondents' motion to dismiss pursuant to its authority under Rule 4.

In their motion, Respondents contend the petition is untimely, even accounting for certain appropriate tolling periods, and should be dismissed. Doc. 24. Petitioner avers the petition was timely under California's safe harbor rule[5] and equitable tolling, that Respondents do not appear before this Court with "clean hands," and that a viable claim of factual innocence warrants review of the petition. Doc. 31. The Court addresses the parties' contentions in turn.

### B. Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

As the United States Supreme Court has explained, AEDPA "requires a state prisoner whose conviction has become final to seek federal habeas corpus relief within one year. 28 U.S.C. § 2244(d)(1)(A). The Act tolls this 1–year limitations period for the 'time during which a properly filed application for State post-conviction or other collateral review ... is pending.' § 2244(d)(2)." *Evans v. Chavis*, 546 U.S. 189, 191-92 (2006) (emphasis in original).

Respondents concede Petitioner was entitled to some tolling but argue that his habeas petition with this Court was, nonetheless, untimely. According to Respondent, Petitioner: (1) was not entitled to tolling for the time his first state habeas petition was pending; (2) was entitled to twenty-eight days of statutory tolling for his second state habeas petition; (3) was not entitled to tolling of the 212 days between the denial of his second state habeas petition on January 15, 2013,

---

[5] The Court disposes, via a footnote, Petitioner's contention that his petition was presumptively timely under California's safe harbor rule. In the very case which Petitioner cites, the California Supreme Court explained:

> A petition for a writ of habeas corpus [in a capital case] will be presumed to be filed without substantial delay if it is filed within 180 days after the final due date for the filing of appellant's reply brief on the direct appeal or within 36 months after appointment of habeas corpus counsel, whichever is later." (Supreme Ct. Policies, policy 3, std. 1–1.1.)

*In re Reno*, 55 Cal. 4th 428, 461 (2012), *as modified on denial of reh'g* (Oct. 31, 2012). As this is not a capital case, the safe harbor rule does not apply.

11

and the filing of the third state habeas petition on August 15, 2013; and (4) was entitled to 126 days of statutory tolling for his third and fourth state habeas petition. Respondents thus agree that Petitioner was entitled to a combined 154 days (28 days plus 126 days) of tolling. Consequently, Petitioner had until May 21, 2014 (154 days after December 18, 2013—a year after Petitioner's convictions became final), to file his habeas petition with this Court. Petitioner asserts equitable tolling was warranted for the 212 days between his second and third state habeas petitions due to: (1) the time the trial court reporter needed to prepare transcripts of the evidentiary hearing; (2) the time needed for the transcripts to be forwarded to Petitioner's then-counsel of record, Glenn Kottcamp;[6] (3) the time needed for Kottcamp to address new evidence and review the state court's decision; and (4) Kottcamp's precarious medical condition.

The question, therefore, is whether Petitioner is entitled to tolling of the 212 days between the denial of his second state habeas petition on January 15, 2013, and the filing of the third state habeas petition on August 15, 2013.

"Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Holland v. Florida*, 560 U.S. 631, 655 (2010) (internal quotations omitted). And "[t]he diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." *Id.* at 653 (internal quotations omitted). "Petitioner must show that some external force caused his untimeliness, rather than mere oversight, miscalculation or negligence. In other words, Petitioner must have been delayed by circumstances beyond [his] direct control, and not by his or his counsel's own mistake." *Velasquez v. Kirkland*, 639 F.3d 964, 969 (9th Cir. 2011) (internal quotations omitted).

---

[6] Kottcamp's name appears on Petitioner's first, second, third, and fourth state habeas petitions as counsel of record, along with Roger Nuttall, from the law firm of Nuttall & Coleman. Lodged Docs. 5, 7, 9, 11. Kottcamp signed the first and second petitions. Lodge Docs. 5, 7. Nuttall signed the third, fourth, and fifth petitions. Lodged Docs. 9, 11, 13.

Petitioner's first two explanations address only part of the delay, namely nineteen of the 212 days. His explanations relate to the time needed for completion and receipt of the reporter's transcript following the state court evidentiary hearing on January 14 and 15, 2013. The court reporter completed the transcript sixteen days after the hearing and Kottcamp received the transcript four days later, on February 4, 2013. Lodged Doc. F, Declaration of Roger T. Nuttall ("RTN Declaration"). This amounted to nineteen days wherein Petitioner did not have access to the transcript in preparing his third habeas petition. But Petitioner provides no explanation for how the lack of a transcript for nineteen days prevented or hindered his effort to submit his third habeas petition in a timely fashion. *See Pace*, 544 U.S. at 418; *Miranda v. Castro*, 292 F.3d 1063, 1065 (9th Cir. 2002) (noting the petitioner "bears the burden of showing that this extraordinary exclusion [from AEDPA's one-year statute of limitations] should apply to him"); *see also Lloyd v. Van Natta,* 296 F.3d 630, 633-34 (7th Cir. 2002) (per curiam) (concluding equitable tolling does not apply due to the lack of a complete trial transcript because petitioner "was present at his trial and knew the basis on which he could have asserted [his habeas claims]"), *cert. denied,* 537 U.S. 1121 (2003). Failing so, the Court cannot find that equitable tolling applies to nineteen of the 212-day gap.

As for Petitioner's remaining explanation (that Kottcamp, who suffered a precarious medical condition,[7] needed time to address new evidence, review the transcript, and conduct the requisite legal research), the Court finds it tenuous and short of an "extraordinary circumstance" required for equitable tolling. What Petitioner deemed "new evidence" was Basurto's testimony. But, this characterization of the delayed review of the exculpatory testimony of Basurto as "new evidence" is questionable given that Kottcamp was not the only attorney representing Petitioner. Present counsel, Nuttall, also represented Petitioner in his first and second state habeas petitions, actually met with Basurto in 2010 and thereafter obtained a declaration containing the same

---

[7] Kottcamp died of acute respiratory distress syndrome on December 22, 2013, over four months after the third state habeas petition was filed on August 15, 2013. RTN Declaration; Lodged Doc. 9.

13

information Basurto provided at the evidentiary hearing. Lodged Docs. P, H. Counsel thus had knowledge of the "new evidence" and its potential effect on Petitioner's claims even if they did not know how Basurto would testify. Other than the precise details, counsel knew the intended effects of Basurto's statements long before the evidentiary hearing. And, it was Nuttall who represented Petitioner at the evidentiary hearing and examined Basurto. RTN Declaration; Lodged Doc. F.

Further weakening Petitioner's explanation is the fact that the second and third state habeas petitions are largely similar, except for the addition of the exact exculpatory testimony of Basurto. The petitions contain identical claims laid out in nearly identical fashion. This stands in contrast to the case Petitioner cites, *Richardson v. Cate*, No. C 09-02227 WHA, 2010 WL 1486476, at *2 (N.D. Cal. Apr. 13, 2010), wherein "the petition that was filed in the Court of Appeal . . . was almost three times as long as the petition that had been filed in the Superior Court." And while the Court does not take lightly the medical condition and subsequent death of Kottcamp, the circumstances here do not parallel that faced by the petitioner in *Richardson*, where he "became suicidal after learning that his habeas petition had been denied and tried to commit suicide several times" and his "counsel faced a family death, appointment as a trustee over a complicated estate plan, a major surgery and rehabilitation." *Id.* at *2-*3.

Petitioner also asserts that time should be allowed for him to obtain the records from Kottcamp's residence after his death on December 22, 2013, and after the California Supreme Court denied the habeas petition. He contends that the law firm which employed Kottcamp "had no access" to the records for fifteen days and that additional time was also needed for new associate counsel "to gather all the relevant documents from Kottcamp's records, and to review the complex issues along with the voluminous records." Doc. 31. Petitioner provides no authority, however, for his position that time should be given when Nuttall continues to represent Petitioner at all relevant times, before and after Kottcamp's death. And as to the contention that additional time was need for Petitioner to investigate newly discovered evidence concerning his trial counsel's

14

competency, that contention, which the Court discusses below, is meritless.

The Court is therefore unconvinced that equitable tolling should apply based on Petitioner's explanations concerning new evidence and Kottcamp's health. Petitioner is thus not entitled to equitable tolling of the 212 days between the denial of his second state habeas petition and the filing of the third state habeas petition.

### C. Discovery of New Evidence

Equitable tolling aside, Petitioner avers AEDPA's one-year statute of limitations actually commenced on June 14, 2014, when he discovered new evidence to support his ineffective assistance of counsel claim, namely the incompetency status of his trial counsel, H. Ronald Sawl. Petitioner further argues he did not learn of Sawl's incompetency earlier because Respondents failed to disclose Sawl's state bar proceedings, which would have revealed his mental infirmity. Petitioner alleges Respondents had a duty to disclose, and that in failing to do so they also violated the clean hands doctrine.

"Under [AEDPA], a state prisoner ordinarily has one year to file a federal petition for habeas corpus, starting from 'the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.' 28 U.S.C. § 2244(d)(1)(A). If the petition alleges newly discovered evidence, however, the filing deadline is one year from 'the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.' § 2244(d)(1)(D)." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1929 (2013). "And . . . to have the factual predicate for a habeas petition based on ineffective assistance of counsel, a petitioner must have discovered (or with the exercise of due diligence could have discovered) facts suggesting both unreasonable performance *and* resulting prejudice." *Hasan v. Galaza*, 254 F.3d 1150, 1154 (9th Cir. 2001). But "[t]his is not to say that [a petitioner] needed to understand the legal significance of those facts-rather than simply the facts themselves-before the due diligence (and hence the limitations) clock started ticking." *Id.* n. 3.

15

Petitioner alleges that on June 14, 2014, his counsel learned from an associate assigned to work on the case, that Sawl had been ineligible to practice law since April 21, 2012. RTN Declaration. It is true that by an order filed on April 18, 2012, the California State Bar involuntarily placed Sawl on inactive status. Doc. 31, Ex. 3. But the Bar did not declare Sawl incompetent, only that he was unable to assist his counsel with a disciplinary proceeding, which began in 2008, due to a mental infirmity caused by his medical condition and physical difficulties. Doc. 31, Ex. 3. The Bar did not declare Sawl incompetent or unfit to engage in the practice of law. Nevertheless, that Sawl was placed on inactive status as a member of the California bar was not the factual predicate of Petitioner's ineffective assistance of counsel claim.

The inquiry under an ineffective assistance of counsel claim is whether "(1) . . . counsel's representation 'fell below an objective standard of reasonableness,' [*Strickland v. Washington,* 466 U.S. 668, 688 (1984)] and (2) that counsel's deficient performance prejudiced the defendant, *id.,* at 694." *Roe v. Flores-Ortega*, 528 U.S. 470, 476-77 (2000). The factual predicate for such a claim must therefore concern counsel's representation. In this case, the alleged error in representation was Sawl's failure to investigate and compel Basurto to testify at Petitioner's trial, a fact which Petitioner knew of at the time of trial. Not only did Basurto know of this fact, which suggested Sawl's unreasonable representation, but Petitioner also knew of the facts, suggesting the allegedly resulting prejudice that the jury heard testimony from Valencia and the officers without the benefit of hearing Basurto's allegedly exculpatory testimony.

The State Bar order understandably raised questions as to Sawl's mental condition at the time of Petitioner's trial. And as Petitioner states, Sawl's mental condition might have interfered with his "ability to form successful trial tactics as to Basurto's testimony." But a claim of ineffective assistance of counsel could be raised by Sawl's failure to call Basurto as a witness, apart from what may have caused Sawl to make the decisions he did. The discovery of Sawl's incompetency therefore was not the factual predicate of his ineffective assistance of counsel claim,

16

and therefore did not delay the commencement date of AEDPA's one year statute of limitations.

While Petitioner insists Respondents had a duty to disclose the State Bar decision, he provides no such authority. The cases he cites do not expound such a duty. The State Bar's decision regarding Sawl is not exculpatory evidence such that Respondents were required to disclose. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment").

Finding Petitioner's new evidence does not satisfy the factual predicate necessary to trigger section 2244(d)(1)(D) and that Respondents were not under a duty to disclose the evidence, the Court need not address Petitioner's contention that Respondents violated the clean hands doctrine.

*D. Actual Innocence*

Finally, Petitioner contends he has presented a viable claim of actual innocence warranting this court's review of his federal habeas petition.

"[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . [the] expiration of the statute of limitations." *McQuiggin*, 133 S. Ct. at 1928. But a " 'petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.' " *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 329). And "[i]n assessing the adequacy of petitioner's showing . . . the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on 'actual innocence' allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial." *Schlup*, 513 U.S. at 329. The district court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial[,]" *id.* at 331-332, and "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Id.* at 332.

Petitioner's claim of actual innocence here rests on Basurto's testimony at the evidentiary hearing wherein he recanted his own trial testimony that he implicated Petitioner in order to protect himself. Petitioner alleges that had the jury heard Basurto's testimony, they would learn that it was Basurto who killed the three men and attempted to kill Valencia, and that Basurto falsely promised Petitioner not to kill the men. The testimony would buttress Petitioner's position that he never intended to aid and abet Basurto in the killing. Petitioner would thus have the Court believe that had Basurto's testimony been available at his trial, no reasonable juror would have found him guilty beyond a reasonable doubt. The Court, however, is unconvinced.

At Petitioner's trial, the parties stipulated to Basurto being the shooter. Lodged Doc. E. Additionally, Valencia, the sole surviving victim, did not testify that Petitioner was the shooter, only that he "saw them shoot." Lodged Doc. T. He testified to seeing flashes from the shots but did not identify the exact shooter. Any testimony from Basurto that he was the shooter would, therefore, be of little additional probative force. Indeed, Basurto's testimony would contradict Valencia's, whose testimony informed the jury that Petitioner had a gun, was the one who gave all the orders to Basurto to collect the victims' wallets, tie them up and kill them, and threatened to kill Basurto if he did not comply. Lodged Doc. T. If believed, Basurto's testimony would thus call into question Valencia's testimony. But the Court need not engage in a detailed comparison of Basurto's testimony against that of Valencia's. Its inquiry involves considering the overall evidence of guilt adduced in connection with Basurto's testimony. *See id.* at 331-332.

And, here, Basurto's testimony fails to carry the probative weight Petitioner urges. The jury did not hear testimony from Valencia alone. They heard testimony from a number of officers, including Detective Alvarado who testified about Petitioner's extensive postarrest statements about the kidnappings and murders. They also heard Petitioner's testimony containing his version of the events, which conflicted with Valencia's and Detective Alvarado's. And from these testimonies, along with the evidence, the jury made their determinations, weighing the witnesses' credibility and

18

drawing inferences from the information presented. *Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) *cert. denied,* 134 S. Ct. 2843 (2014) (noting "the exclusive province of the [jury] to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts"). In fact, Basurto's testimony would have undermined Petitioner's in at least two instances. For example, Petitioner testified that he pointed his gun at the men, but Basurto testified that while Petitioner had a gun, at no time did he use it. And contrary to Basurto's testimony that he ordered Francisco tie up the victims, Petitioner testified it was Basurto who took the victims' wallets and tied them up. Lodged Docs. 2, F.

Further, the timing of Basurto's exculpatory statements raises some doubt concerning their probative value and Basurto's credibility. His appeal process ended in 2008. Lodged Doc. H. This meant that his testimony, along with his 2010 declaration, could not negatively impact his own case. This also meant he was free to make statements which would help Petitioner, regardless of their veracity.

The Court agrees with the state court and defers to its findings on credibility. *See Marshall v. Lonberger,* 459 U.S. 422, 434 (1983) ( "Title 28 U.S.C. § 2254(d) gives federal habeas corpus courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state court, but not by them."); *Greene v. Henry,* 302 F.3d 1067, 1072 (9th Cir.2002) ("Under the AEDPA, we are required to 'defer to state court findings of fact unless based on an unreasonable determination of the facts in light of the evidence presented' in the state court proceedings.") (quoting *Ainsworth v. Calderon,* 138 F.3d 787, 790 (9th Cir.1998), amended at 152 F.3d 1223). After hearing Basurto's testimony, the state court found unbelievable that Basurto now wished to vindicate Petitioner, and that Basurto's motive was unrelated to the fact that he and Petitioner were housed in the same prison but different yards. The state court also found unbelievable that if the drug deal actually involved a half a million dollars, as Basurto testified, that he somehow managed to carry all that money with him when he left the house. The state court found Basurto to be "a

terrible witness . . . wholly unbelievable with respect to all of his attempts to exculpate [Petitioner] from responsibility here." Lodged Doc. F.

The Court therefore concludes Petitioner has not raised a convincing claim of actual innocence. *McQuiggin*, 133 S. Ct. at 1936 ("[t]he gateway should open only when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error") (internal quotations omitted).

E. RECOMMENDATION

Based on the foregoing, the Court recommends that Respondent's motion to dismiss be GRANTED and the petition be DISMISSED with prejudice for Petitioner's failure to comply with 28 U.S.C. § 2244(d)'s one year limitation period.

Within thirty **(30)** days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen **(14)** *court* days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst,* 951 F.2d 1153, 1156-1157 (9th Cir.1991).

IT IS SO ORDERED.

Dated:   **December 7, 2015**          **/s/ Sandra M. Snyder**
                                   UNITED STATES MAGISTRATE JUDGE